ROSILE LE DUC v. NORTHERN PACIFIC RAILWAY COMPANY.[1]

June 3, 1904.

Nos. 13,832—(98).

**Defective Appliance.**

In an action by an administratrix to recover for the death of her husband, a switchman, who fell from a locomotive while engaged in the performance of his duties, and was killed, upon an examination of the evidence it is *held* that the verdict for the plaintiff was sufficiently supported in the following respects:

1. That a footboard and tool box on the rear of an engine tender were defective.

2. That such defects were the proximate cause of intestate's injuries and death.

3. That intestate was himself in the exercise of ordinary care at the time of the accident.

[1] Reported in 100 N. W. 108.

**Master and Servant—Rules.**

The employer may promulgate reasonable rules for the conduct of his business, and require observance thereof by employees; and whether such rules are intelligible and reasonable is a question of law for the court.

**Ambiguous Rule.**

But if a rule thus promulgated is open to doubt as to its construction and meaning or its application to the duties to be performed by the employee, such doubt presents an issue of fact upon the evidence to be determined by the jury.

**Inspection of Appliances.**

The master furnishing instrumentalities for the use of a servant engaged in a hazardous occupation cannot absolve himself from the duty of maintaining the same in a reasonably safe condition by a rule that the servant must inspect the appliances he uses for his own protection, and furnish information of defects to the master, without reference to the character of the employment, the specific duties required, or the means and opportunities of the servant for making the inspection.

**Same.**

*Held*, upon consideration of the duties of an employee to step upon a footboard of an engine and protect himself by a handhold thereon while such engine was moving, that a rule requiring him to inspect the same and report defects did not deprive him of protection because the evidence did not show it had been observed.

Action in the district court for St. Louis county by plaintiff, as administratrix of the estate of Oliver L. Le Duc, deceased, to recover $5,000 for the death of decedent. The case was tried before Dibell, J., and a jury, which rendered a verdict in favor of plaintiff for $4,000. From an order denying a motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Affirmed.

*J. L. Washburn* and *W. D. Bailey,* for appellant.

*John Jenswold, Jr.,* for respondent.

LOVELY, J.

This is an action by an administratrix to recover for the death of her husband from injuries while employed by defendant as switchman in its terminal yards at Duluth. There was a verdict for plaintiff, a mo-

tion for judgment, or a new trial in the alternative, which was denied. Defendant appeals.

The cause was submitted to the jury upon instructions which limited the recovery to the consideration of defects in two appliances of a locomotive engine on which intestate was required to work, viz., a tool box and the footboard at the rear of the tender. Defendant insists here, as on the trial, that intestate assumed the dangers incident to the existence of these defects, and contributed to the injury causing his death; also that he disregarded certain rules established by the company for his protection.

Intestate was a switchman, and familiar with the duties of the service, which required him to work on engines in the yard while moving backward and forward pulling or pushing cars upon the numerous tracks therein. He was under the immediate direction of a foreman, while another member of his crew (Gibbons) was working in the field with him. In the performance of their duties they would together attend engines moving in the yard with strings of cars, while each gave orders to the engineer, and rode on the footboards when necessary. They were also to watch the switches, and see that they were properly set. Intestate went upon duty, according to the usual custom, about seven o'clock in the evening, worked all night, and left about six thirty next morning. He and the other members of the crew, at the quitting time on the morning of the accident, supposing their duties had ended, were about to leave, when the engineer of a locomotive received orders to shove a string of cars to a bridge at some distance on the main track. Between the engine and the cars were four switches on the right side in the direction it had to move backwards. The crew returned to the engine.

Intestate, being required to get upon the rear footboard of the tender to perform the duties required of him, stepped on the right-hand side as it fronted. When it had moved about a car length Gibbons also stepped on the same side of the same footboard. Both switchmen stood with their backs to the tender facing the direction in which it was then backing, as was proper. Gibbons, who saw more of the accident than any one else, stated at the trial that intestate was using the handhold, and after he got on the engine that he endeavored to go around the drawbar, which extended beyond it, and had to turn

towards the front; that in doing so it was customary to swing the leg around the drawbar as he did. While the deceased and Gibbons were occupying the positions indicated, deceased hallooed, grabbed, fell forward, touching Gibbons, attempted to again catch the handhold, but did not succeed. He dropped a pail and lantern from his hand, caught the handle of an old lantern in the tool box, fell upon the track, and was run over. While no one could tell the exact manner in which the accident happened, the presumption consistent with the duties deceased was to perform requires us to assume from the situation that intestate, when Gibbons stepped on, endeavored to go to the other (right) side of the tender footboard, retaining his grip of the handhold, to observe the four switches on that side.

The trial court submitted the cause upon alleged defects in the rear footboard and tool box solely. These appliances were portions of the engine upon which it appears deceased had worked a night, or part of two nights. The rear of the engine tank rose about two feet in the perpendicular, and then sloped upwards towards the front of the engine. The footboard referred to was a plank ten inches in width, bolted on two iron straps which reached down from the tank. An iron rod—the "handhold"—was held by two posts, and extended nearly the entire width of the tank at the rear, but was fastened to the tender at such a height that it was about even with a person standing on the footboard. Immediately back of the handhold, extending its entire length, was a tool box of wood, about eight inches wide, with an iron cover, the lid of which was broken and turned back towards the tank. The rear side of this box was originally, when in proper condition, within two inches of the handhold, barely near enough to enable a switchman standing on the footboard to grasp it, and thus protect himself from falling.

The evidence authorized the conclusion that the iron straps on which the footboard was fastened had become bent from their proper horizontal position, and slanted downwards to some extent, so that a person standing there would have a diminished space whereon his feet could rest while his back was to the tender, and (it being winter) was covered with ice and snow. At the time of the accident the cover of the tool box on the rear of the tender was broken, the wooden sides were warped, and the space next to the handhold was to some extent diminished, so as to make it more difficult for a person to grasp it in

an emergency. The precise locality where the warping existed was not shown, but we think it inferable that it was near the place where intestate attempted to grab the handhold after he had slipped and fallen. It does not appear how long the defective condition of the footboard had existed; neither does it appear that intestate had ever stood upon it before, or had information, other than from casual observation, of its imperfect condition, which was well calculated to increase the perils and hazards he thus encountered.

We have no doubt that the evidence was sufficient to justify the conclusion probably adopted by the jury that the defects in the footboard and tool box were the proximate cause of the injury and death of intestate. Under all the circumstances it would be for the jury to say whether the defendant exercised ordinary care in providing intestate with reasonably safe instrumentalities and appliances wherewith he was to perform his duties. Intestate had the right to assume that the defendant had done this; and the jury were authorized, in the absence of any showing to the contrary, to adopt the necessary inferences that intestate exercised due care in performing his work, and pursued the usual and customary course. Nor can we say that it appears conclusively that any information intestate possessed from his use of the engine as shown in the evidence conveyed to him sufficient knowledge of the defective footboard and tool box, or that he had reason to suppose that they were not in proper condition for his use. These facts would seem to be better known by the defendant, who had possession of the engine, and could easily have inspected the same, as in duty bound; and in view of the presumptions due to intestate that he exercised reasonable care, and that he was performing his duties in the usual manner, doubts in this respect cannot be determined against the exercise of the necessary caution that was required of him, but must be resolved in his favor.

It was urged that intestate failed in the exercise of due care upon evidence showing that it was safer for him to stand on the end of the footboard, when the engine was in motion, than at places between; yet it was obviously apparent that switchmen were required to stand at all places on the footboard, and would often have to move from one end to the other when occasion demanded. It was placed there for such purpose, and when Gibbons, following intestate, stepped on after him,

it may well have been regarded by intestate as his duty to move across the footboard to the left end, and stand there to watch the four switches he was to pass before reaching the string of cars to which the engine was to be attached. The position of intestate was perilous at best, and we cannot convict him of contributory negligence in encountering the perils which his duties imposed; nor does it seem reasonable to hold that he must have appreciated the risk from the slanting footboard and the imperfect means afforded to protect himself by the handhold. The questions of assumption of the risk and contributory negligence were for the jury.

It is further insisted for defendant that, if intestate had obeyed certain rules promulgated for his protection, he would not have been injured. In disposing of this appeal we shall assume that these rules were known to the intestate. They were as follows:

> 60. The greatest care and watchfulness must be exercised to prevent injury or damage to persons or property; in case of doubt take the safe course and run no risk.

> 65. If defective or dangerous condition is discovered, or known to exist, in the construction of tracks, structures, equipment, appliances, tools or other property whereby hazard exists or casualty might result, immediate and full report must be telegraphed to the head of department and superintendent.

> 67. Employees are required to see for themselves that the machinery or tools which they are expected to use are in proper condition for the service required, and, if not, to put them in proper condition, or see that this is done, before using them.

To support its contention, defendant relies upon the case of Scott v. Eastern Ry. Co., 90 Minn. 135, 95 N. W. 892, where a conductor, who had authority to order the movements of his train, fell under one of the cars in getting on where the steps of a caboose were out of repair to such an extent that slight observation would have discovered this condition. The rule in that case required the conductor to be at the train half an hour before it started, and to cause an inspection or make the same himself. He had ample opportunity to do this, and the defect could have been readily discovered if it had been done, for the train could not start without his signal. Under these circumstances it was

held that the rule which imposed the duty of inspection of the caboose steps upon the conductor, or required him to see that it was done by the brakemen, was a reasonable regulation for the protection of the employees and others, and its disobedience was held to be the proximate cause of his injury.   We held also in that case that the reasonableness of rules promulgated by the master was for the court.   This doctrine will be adhered to, and is as far as we are inclined to go.   We did not intend in the Scott case to relieve the master from his common-law obligation to furnish reasonably safe instrumentalities to his employees, nor did we intend to hold that by promulgation of rules the master can absolve himself from any proper legal duty to his employee, and transfer that obligation solely to the servant.

When rules are reasonable, their meaning and construction clear, their necessity apparent, obedience proper and practical, it is within the authority of the master to require their observance, and, if the failure to obey by the servant is the proximate cause of an injury, the master will be relieved as a matter of law; but in this instance the doctrine in the Scott case does not relieve defendant.   The instrumentality to be observed and inspected by the servant was an engine, and we cannot believe that it would be assumed by an ordinary switchman that he would regard it as his duty, under the rules quoted, to make a thorough inspection of a locomotive before going upon a footboard in an emergency to do his work.   The most that could be sensibly claimed would be that he was required to examine and report defects of the particular appliance which he would be expected to use, and that a failure to give the results of his knowledge would be an omission of duty on his part; but the master cannot be absolved by the publication of rules from his primary duty to furnish reasonably safe instrumentalities for the servant's use, particularly where such rules impose doubtful obligations which he cannot be reasonably expected to follow, when the exigencies of his work or the time given for the inspection will not permit.

The evidence in this case tends to show that from the orders given, which required intestate to step upon the footboard of the moving engine, he had very little time to engage in an inspection of instrumentalities presumably safe, and which he was using for the first time, so far as appears; or to stop the movements of the engine and make the report thereof.   The master's duty still remained to furnish proper instru-

mentalities. Under the finding of the jury it failed to do so, and whether the servant would have discovered such defects by a better examination than he gave, and would then be required to make a report, or delay the business of the master under the orders upon which he was acting were also questions for the jury, and we are satisfied with their finding in these respects.

Order affirmed.